**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Reflection Window & Wall, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: |
| v. | ) | |
| | ) | |
| TALON WALL HOLDINGS, LLC, | ) | |
| ENTEKK GROUP LTD., CHICAGO | ) | |
| HEIGHTS GLASS, INC., and KURT LEVAN, | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, Reflection Window & Wall, LLC ("Reflection"), for its COMPLAINT against Defendants Talon Wall Holdings, LLC, Chicago Heights Glass, Inc., Entekk Group Ltd., and Kurt LeVan, states as follows:

### NATURE OF ACTION

1.       This action was filed to redress the deceptive—and outright dangerous—methods of competition unlawfully undertaken by Defendants Talon Wall Holdings, LLC , Chicago Heights Glass, Inc., Entekk Group Ltd., and their principal, Kurt LeVan.

2.       As set forth more fully below, the Defendants have engaged in a pattern of reckless and deceptive practices by making materially false and misleading commercial representations to win lucrative construction contracts, including touting their own Talon Wall product as meeting applicable fire-safe standards with the knowledge that such representations are untrue, likely to mislead, deceive and/or result in material harm.

3.       Moreover, when Reflection, an industry competitor, engineered a superior product that actually set new standards for fire-safety, LeVan passed on the opportunity to fairly compete

by improving his own Talon Wall product. Instead, the Defendants opted to engage in further unfair and deceptive practices including the filing of multiple baseless lawsuits that Defendants trumpeted throughout the industry with the purpose and intent to disparage Reflection, to scare away or threaten its prospective customers, to disrupt existing contracts, and to cause substantial damage to Reflection.

4.      All the while, LeVan and the LeVan Companies have continued to deceptively promote the Talon Wall product as the "only" notched curtain wall system that is certified to be fire safe, when the opposite is true.  The unlawful acts of Defendants have caused material harm to Reflection, imperiled and continue to imperil lives and risk untold millions in property damages.

## PARTIES AND JURISDICTION

5.      Founded in 2001, Reflection, is a limited liability company organized and existing under the laws of the State of Illinois, with its principal place of business in Chicago, Illinois, eight additional offices (Philadelphia, New York City, Nashville, San Francisco, Mumbai, Shanghai, Manila and Valencia) and five (5) manufacturing facilities around the world.

6.      Reflection, which conducts business under the assumed name of "Reflection Window + Wall," is an industry leader in the design, fabrication and installation of structural glass facades used in the construction of (mostly) high-rise buildings, both residential and commercial.

7.      With more than fifty (50) full time engineers on staff in more than five (5) countries, Reflection offers the ability to customize construction solutions for every project and is constantly improving and expanding upon its product offerings.

8.      Defendant Talon Wall Holdings, LLC ("Talon Holdings") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in South Holland, Illinois.

9. Defendant Chicago Heights Glass, Inc. ("CHG") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in South Holland, Illinois 60473.

10. Defendant Entekk Group Ltd. ("Entekk") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in South Holland, Illinois.

11. Talon Holdings, CHG, and Entekk each conduct business from the same location at 16500 Vincennes Rd., South Holland, Illinois 60473.

12. Defendant Kurt LeVan ("LeVan") is an individual who is domiciled in the state of Illinois. On information and belief, LeVan is the sole or majority owner of Talon Holdings, CHG, and Entekk (collectively, the "LeVan Companies"), actively manages and controls the operations of each, either as a Manager (with respect to Talon Holdings) or as Chief Executive/President with respect to CHG, and Entekk, and obtains direct financial benefit from the operations of each of Talon Holdings, CHG, and Entekk.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338, predicated upon Section 43(a) of the Lanham Act, the Lanham Act, 15 U.S.C. §1125(a). The Court has pendant jurisdiction pursuant to 28 U.S.C. § 1367 as to the remaining claims.

14. This Court has personal jurisdiction over Defendants, each of which was organized under the laws of the state of Illinois, conducts business in Illinois, committed acts that give rise to this action in Illinois, and have caused damage in Illinois.

15. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(a) and (b).

## FACTS COMMON TO ALL COUNTS

### *Glazed Window Wall and Curtain Wall Systems, Generally*

16.     Reflection has historically been a leading manufacturer and installer of unitized glazed "window wall" systems with myriad patents and proprietary innovations, effectively a system of heavy-duty floor-to-ceiling exterior windows that are inserted into the opening between the top of one floor slab and the underside of the next higher floor slab.

17.     The term "glazed" is a reference to a glass facade (or window), and the phrase "unitized" means that each section of window wall is preassembled, encased by a metal frame assembly (mullions), and ready for installation.

18.     Each individual unitized window wall section is anchored to the building's floor slabs above and below the window, and also anchored laterally to the adjoining window wall to form an integrated aesthetic weatherproofed opening that allows optimal penetration of natural light (*see* image below):



19.     Because unitized segments can be (and usually are) installed from inside the structure, they are generally regarded as the most efficient and cost-effective way to erect a structure with a predominantly glass opening.

4

20.     By contrast, a glass curtain wall is a heavy-duty exterior, encased by mullions, but instead of being installed *between* and supported between slabs, the curtain wall is suspended (like a curtain) *in front* of the slabs and covers the entirety of a building's facade.  Unitized curtain walls are most often also installed from the interior of the building.

21.     The diagram below reflects the difference between a window wall (installed between and even with the floor/ceiling slabs) and curtain walls (suspended in front of and anchored to floor/ceiling slabs):



22.     While the installation process of the glass curtain wall is generally more complex and expensive, it offers the aesthetic of a full glass exterior with fewer field installed pieces.

23.     There are numerous manufacturers of window wall systems and curtain wall systems.  Generally and historically, window wall systems have been favored for residential high-rise projects, while curtain walls systems have been favored for commercial high-rise and podiums of buildings.

24.     Reflection manufactures numerous window wall systems, elements of which Reflection has sought and received U.S. patent protection.

25.     Prior to 2020, Reflection did not manufacture curtain wall systems, relying upon third parties that specialize in manufacturing curtain wall, as needed.

26.     Talon Holdings offers a glass curtain wall system called "Talon Wall" that it developed in 2016, aspects of which have been patented.

27.     Talon Wall uses an anchor that offers some efficiency in the anchor attachment step of the installation process.

28.     CHG and Entekk manufacture, sell and install Talon Wall throughout the Chicagoland area, although they lack the capacity to supply more than 2-4 completed systems per year on their own.

### Fire Safety with respect to Window and Curtain Wall Systems

29.     Among the advantages of a window wall system, particularly with respect to high-rise buildings, is fire safety at the edge of slabs that prevents fire from traveling upward, because the major framing elements are fully compartmentalized between the top of a concrete slab and the underneath of the floor slab (ceiling) above.

30.     Because the window wall is installed *between* floor slabs (which slabs can generally withstand exposure to fire for at least two hours), there is no opening (or void) through which fire or smoke can pass directly between floors of the building, thus, by design, window walls can effectively impede the spread of fire and hot gasses from floor to floor.

31.     To the extent that fire was to breach the void between a window wall section and floor/ceiling slab, the flame would be drawn (by oxygen) out of the building, thereby protecting units above it from both fire and smoke.

32.     As such, window wall systems are known for exceeding fire safety objectives for the spread of flames and hot gasses floor to floor and hence international and local building codes do not require edge-of-slab fire safing for window wall which are required for curtainwall products.

33.     By design, curtain walls are inherently less effective than window walls at preventing the spread of fire and smoke from floor to floor.

34.     The natural void created by suspending a curtain wall (whether a notched or unnotched system) from the back of the vertical framing to the edge-of-slab along the outside of the building creates an opportunity for fire, smoke, and hot gases to pass rapidly within the building to floors directly above igniting any flammable substances in its path.  Because of this, both international and local building codes nationally require a minimum two hour "safety zone" established by the widely accepted industry standard ASTM E 2307 and International Building Code Section 715.4 for fire protection and fire tests for building construction materials.

35.     In view of the edge-of-slab void inherent in a curtain wall system, the utilization of fire-retardant packing materials within the curtain wall void are essential in order for a unitized curtain wall system to meet or exceed the two-hour fire spread resistance between floors required by international building code.  In this regard, the manner in which such fire-retardant packing materials are installed can critically influence its effectiveness as a fire-safety measure.  More particularly, application of the fire-retardant materials after a curtain wall panel is installed enables visual verification that is critically needed to ensure that the materials are properly compressed so that they are free of voids which will compromise the ability of the system to capably prevent the passage of flame and hot gasses sufficient to ignite cotton waste.

36.     By contrast, the installation of fire-retardant materials onto the panel before installation of the curtain wall panel results in a blind application and cannot provide the critical

visual verification needed to reliably confirm proper compression and the absence of voids between mineral wool segments. Accordingly, the effectiveness or reliability of fire-retardant measures installed blindly before the installation of a curtain wall panel, where no visual verification can be made, is highly suspect and cannot provide a verified fire-safety installation according to applicable standards and requirements. As such, the International Building Code (which applies to all mid and high-rise buildings) contains provisions on Fire and Smoke Protection (Chapter 7) specific to "Exterior curtain wall/fire-resistance-rated floor intersections," requiring that:

> Voids created at the intersection of exterior curtain wall assemblies and fire resistance-rated floor or floor/ceiling assemblies shall be protected with an approved perimeter fire containment system to prevent the interior spread of fire. Such systems shall provide an F rating for a time period not less than the fire-resistance rating of the floor or floor/ceiling assembly.

*See* 2021 International Building Code, § 715.4.

37. The inherent fire safety risks associated with curtain walls, in general, is actually exacerbated by the specific design of the Talon Wall. Among other things, the hallmark of Talon Wall's anchor is the continuous shelf that runs horizontally across the entire upper span or head of each wall segment. The below image shows the continuous shelf of the Talon Wall anchor.



38.     As set forth more fully below, while this continuous shelf simplifies anchoring the Talon Wall to the floor slab, it also covers (thus prevents visual and physical access to), the void that is naturally created during installation, substantially inhibiting the ability to ensure or visually field-verify proper installation of any "fire resistance-rated floor or floor/ceiling assemblies" required in building codes that call for fire containment materials along the entire void.

39.     The absence of such visual verification of proper compressed fire-retardant packing materials makes it nearly impossible to ensure that there are no voids present.  This fact critically undermines the reliability of any representation as to the system's effectiveness in preventing the interior spread of fire and hot gasses as required by International Building Code, § 715.4 and ASTM E 2307.

40.     More particularly, if adequate and reliable fire safety performance requires visual verification that the fire-retardant packing was properly installed absent voids, the inability of the Talon Wall to provide such visual verification renders the actual fire safety capabilities of the installed system to be wholly unverified and incapable of substantiation.

41.     Historically, when installing Talon Wall, CHG has simply applied a thin silicone weather seal above and below the slab (but has not filled or attempted to fill the curtain wall void whatsoever between the slab edge and the vertical mullion with any fire-protective materials).

42.     Because silicon will burn (and act as fuel) within minutes of direct exposure to a fire, it is not even effective in substantially slowing (let alone preventing) the spread of fire and hot gasses.  The open vertical notch of the Talon Wall can compound fire spread by feeding oxygen to the unprotected curtainwall gap.  The below image is a photograph showing a Talon Wall installation which shows the curtainwall gap.



43.     In essence, therefore, whether by design or dangerous oversight, Talon Wall promotes installation efficiency at the direct expense of fire safety.

***Defendants' Misrepresentations regarding the Fire Safety Risks Inherent with Talon Wall.***

44.     Since 2016, CHG and Entekk have vigorously competed with Reflection, touting the perceived benefits of Talon Wall relative to Reflection's window wall systems.

45.     To attempt to negate the competitive advantage with respect to fire safety inherent with window wall, Defendants routinely obtained opinion letters from Global Fire Protection Group, LLC. ("Global") which LeVan and the LeVan Companies would provide to building owners, contractors, architects and/or other persons having authority or influence over the purchasing decision of the facade system for particular building projects.  Such opinion letters ("Global Opinion(s)") were utilized by LeVan, the LeVan Companies and their licensees such as Alliance Glazing Technologies ("Alliance Glazing") and Peerless Products Inc ("Peerless Products") in the course of promoting the sale of Talon Wall for building projects.  A representative example of a Global Opinion dated April 12, 2018 is attached hereto as **__Exhibit A__**.

46.     As shown representatively in Exhibit A, Global Opinions utilized by LeVan, the LeVan Companies and their licensees such as Alliance Glazing and Peerless Products were identified and titled as being an "Engineering Judgment," and would claim (without verification from any actual testing or even, upon information and belief, a first-hand evaluation of the Talon Wall) that "[a]s designed, the [Talon Wall] system does not present an exposure hazard between floors [for] allowing the passage of fire between floors of the window wall assembly."  Exhibit A.

47.     The Global Opinions would then summarily conclude that "[i]t is the *opinion* of Global that the installation of a listed firestop system similar to that required for a typical curtain wall installation, is not required." (*emphasis added*).  Since Talon Wall was not (and is not) a "listed firestop system," LeVan and the LeVan Companies utilized the Global Opinions to attempt to persuade building owners, contractors, architects and/or other persons having authority or influence over the purchasing decision of the facade system that the Talon Wall was an acceptable substitution to a publicly listed facade system from the standpoint of fire prevention.  Nothing could be farther from the truth. LeVan and the LeVan Companies deceptively touted and inflated the nature and authority of the Global Opinions.

48.     Generally, a publicly listed firestop system with regard perimeter facade systems means a product that has a Published Design Listing under the ASTM E 2307 fire safety standard. A Published Design Listing under ASTM E 2307 is widely viewed as being the most reliable certification for establishing the fire-stopping capabilities of a building facade system since it reflects that the product was independently peer reviewed and tested by a recognized and accredited certifying authority.

49.     By contrast, an engineering judgment is a design recommendation from a registered professional engineer that an unlisted firestop system should be able to perform in accordance with a fire-prevention standard without actually testing or evaluating the system. Thus, an engineering

judgment, is an unverified and untested proposal that a proposed firestop system will perform to certain criteria because it has certain features *of the type* utilized by *other* products that have actually been tested and verified.

50.     Overall, level of examination and review associated with engineering judgments are far more informal and less exacting than Published Design Listings.  In view of this, industry associations focused on firestop systems have developed formal guidelines for their preparation and content. Notably, the recommended guidelines of the International Firestop Counsel specify that since recommendations of engineering judgments "are not based upon identical designs as that which were fire tested, *it is important* that they be developed using sound engineering principles."  A copy of the Recommended IFC Guidelines of the International Firestop Counsel is attached hereto as **Exhibit B**.  (*emphasis added*).

51.     Although Global Opinions were titled and held out by LeVan and the LeVan Companies and their licensees such as Alliance Glazing and Peerless Products as being "Engineering Judgments," they failed to conform with many of the most basic qualifications that embody a reliable or studied engineering judgment.  As one example, to be credible an engineering judgment should "[b]e based upon interpolation of extension of previously tested firestop systems that are either sufficiently similar in nature or clearly bracket the conditions upon which the judgement is to be given."  Exhibit B.  A credible judgment should also "[r]eference tested system(s) upon which design [the engineering judgment] is based on."  *Id*.  Engineering judgments should also be "limited only to specific condition or configurations upon which the judgment was rendered and should be based upon reasonable performance expectations … under those conditions. *Id*.

52.     The Global Opinions failed to satisfy any of the above criteria and never should have been represented or held out as being engineering judgments by LeVan and the LeVan

Companies and their licensees such as Alliance Glazing and Peerless Products. Namely, the Global Opinions failed to identify any tested system forming the basis of the purported judgment and fail to identify or address any specific condition of the building design intended to be addressed – instead, they are unduly broad and generic in scope, seemingly intending to have applicability to any potential condition. The LeVan and the LeVan Companies deceptively utilized the Global Opinions under the guise of being engineering judgments to attempt to persuade third parties to purchase the Talon Wall for particular building projects.

53. On information and belief, LeVan knew (or he certainly should have known) that the Global Opinions were not credible, yet he touted the flawed opinions *as if* it were tested and true, and directed, and at times pressured, salespeople, project managers, licensees and agents of the LeVan Companies to tout the flawed opinion to potential customers and members of the building construction industry who have and/or can influence purchasing decisions of building facade systems. LeVan and the LeVan companies deceptively misrepresented, falsely exaggerated and overstated the significance of the Global Opinions to commercially promote the Talon Wall and created material deception by causing potential purchasers to mistakenly believe that the Talon Wall was actually tested and certified in accordance with ASTM E 2307 standards for the prevention of the internal spread of fire and hot gasses.

54. Indeed, even after Global retreated from its opinion and, upon information and belief, directed LeVan to discontinue disseminating the opinion to prospective buyers, LeVan, the LeVan Companies and Talon Wall licensees continued to cite the Global Opinion as proof that Talon Wall was fire-safe in commercial representations to potential purchasers.

55. Based upon the misleading Global Opinion regarding Talon Wall's fire safety, CHG and Entekk (and Talon Wall Holdings) successfully beat-out Reflection for several projects in Chicago between 2016 and 2019, including projects at 2950 North Sheridan, 1326 South

Michigan, Essex Tower (808 S. Michigan), 734 N. Milwaukee and 939 W. Washington Blvd. (Union West projects) and 1375 W. Fulton Ave. As a direct and proximate result of Defendants misrepresenting the significance of the Global Opinion in connection with such projects Reflection lost more than $7M in profits.

56. On information and belief, CHG and Entekk would not have been awarded and/or received economic benefit from any of the above referenced projects had they not misrepresented the fire safe nature of Talon Wall.

57. LeVan continued to falsely promote Talon Wall's fire safety to the marketplace and potential customers throughout 2019 and 2020, using the baseless claim to best Reflection in competitive bidding for additional projects, including The Hard Rock Hotel - Times Square in New York City, and a large high-rise project at One Chicago Square Tower A in Chicago, collectively representing what could have been on the order of $6.3M in profits to Reflection.

58. In early 2020, however, LeVan's own licensees, consultants and prospective customers began to push back against the veracity and credibility of the Global Opinion (which by this point, Global had disavowed), and even employees of CHG and Entekk began to express skepticism to LeVan and the LeVan Companies about whether Talon Wall could reliably claim to be fire safe.

59. More particularly, Antamax Industries, an early third party licensee of Talon Wall (which it rebranded and sold as Fuzewall), has since discontinued offering Talon Wall. Upon information and belief, such decision was made by Antamax due to what it believed were inherent fire safety hazards which were communicated to LeVan. Notwithstanding, LeVan and the LeVan Companies continued to represent the Talon Wall as fire safe in bidding, offering for sale, marketing and promoting its Talon Wall system in connection with numerous high-rise building projects.

60.     To stem the growing chorus of skepticism, LeVan arranged to have Talon Wall secretly tested in or around late June or July of 2020 to determine whether and to what degree it could be deemed fire rated to applicable standards of the American Society for Testing and Materials (ASTM), E 2307.

61.     On information and belief, the fire testing of Talon Wall in 2020 was an unmitigated disaster, as it failed multiple tests, undermining the credibility of the Global Opinion and calling into serious question the safety of occupants in the many buildings (totaling more than 1 million sq. ft of inhabited residential and commercial space) in which the flawed Talon Wall had already been installed or was being installed under the false representation that it was fire safe.

62.     Upon information and belief, LeVan suppressed all information of the failed 2020 ASTM E 2307 Talon Wall tests, taking no steps to address exposed fire gaps in the buildings in which Talon Wall had already been installed, or that was in the process of being installed.

63.     More particularly, at the time Talon Wall failed the ASTM E 2307 testing, LeVan and the LeVan companies continued the installation of Talon Wall on multiple high-rise projects including One Chicago Square and The Hard Rock Hotel Times Square without, upon information and belief, any notification to the local municipalities, general contractors, building owners or occupants that Talon Wall had failed such tests, and without making any offers to recall or remedy the any fire safety deficiencies.

64.     Moreover, LeVan, the LeVan Companies and Talon Wall licensees continued to use the Global Opinion to bid for projects using Talon Wall despite the disastrous failed tests, and neglected to take any steps to remediate the fire risks with the projects that had been completed or were in partial stages of completion utilizing the flawed Talon Wall system.

65.     In total, for over five years, LeVan, the LeVan Companies, and third-party Talon Wall licensees such as Alliance Glazing Technologies, and more recently Peerless Products, Inc.,

marketed, promoted and sold Talon Wall on over a dozen occupied high-rise buildings in Chicago, New York, Denver and elsewhere with no fire preventive material whatsoever installed in the fire gap until December 2021.

***Reflection Develops its Own Curtain Wall System***

66.     In or around 2019, Reflection made the strategic decision to develop its own curtain wall system.

67.     To that end, Reflection hired a Technical Design Director in its San Francisco office with twenty-five (25) years of experience in the design, fabrication, installation and testing of curtain walls.

68.     The Director was tasked with designing and developing a curtain wall from scratch with the objective of revolutionizing (not copying) the many curtain walls systems already on the market.

69.     While those efforts were in full swing, Reflection recruited away CHG's Vice President of Business Development, Joel Phelps, who had been instrumental to CHG's success in head-to-head bidding against Reflection.  Notably, at the time he was hired, Phelps was not a party to any agreement with a post-employment restrictive covenant.

70.     Phelps joined Reflection in June of 2020, just as Reflection was completing its initial designs for its "Universal Wall" (or "U-Wall") curtain wall system.

71.     U-Wall features fewer pieces than typical systems and a state-of-the art speed anchor, making it easier to install than any other curtain wall system on the market (including Talon Wall).

72.     Phelps played no role in the initial design of Reflection's Universal Wall.

73.     Reeling from the loss of its VP of Business Development who was responsible for most of CHG's sales, and faced with the daunting prospects of having to compete with U-Wall, LeVan commenced a specious lawsuit against Phelps and Reflection styled *Chicago Heights Glass Inc., and Entekk Group, Ltd., v. Joel Phelps and Reflection Window Company, LLC,* filed in the Chancery Division of the Circuit Court of Cook County, Illinois as case no. 2021 CH 01326.  In this suit, the plaintiffs asserted meritless claims that the Defendants had misappropriated alleged trade secrets in designing U-Wall.

74.     Notably, the elements that CHG and Entekk claimed were their "trade secrets" were actually commercially available components manufactured and supplied by third parties and/or were not the least bit secret, having been actively promoted and displayed by LeVan and the LeVan Companies at trade shows and in promotional videos posted to YouTube.

75.     The lack of legal merit with respect to the claims, however, did not prevent LeVan from using the specious suit as a competitive weapon, claiming to potential customers and members of the building construction industry who have and/or can influence  purchasing decisions of building facade systems that the suit was somehow proof that Reflection "stole" his trade secrets, and warning anyone who was considering the purchase of the U-Wall that doing so would ensure that they too would be swept up in the suit.

76.     The Court however made quick work of the trade secret claims, dismissing the complaint in its entirety for failure to state any claim, and questioning how components sourced from third parties, without more, could ever qualify as trade secrets.

77.      While the Court gave CHG and Entekk an opportunity to replead, they voluntarily dismissed the trade secret claims, tacitly acknowledging the complete lack of merit.

78.     In an attempt to save face, however, CHG and Entekk filed a Second Amended Complaint filed in the Chancery Court, albeit only against Phelps for what they claim was a breach

of a Severance Agreement that he signed almost two weeks *after* he went to work for Reflection and for his alleged breach of fiduciary duties to CHG. That suit remains pending.

***U-Wall Sets new Standards for Fire Safety, while Talon Wall has Yet Another Disastrous Test***

79.     Although there are numerous differences in the design and performance of U-Wall relative to Talon Wall, perhaps the most notable and significant is that U-Wall has set new standards for curtain wall fire safety.

80.     Unlike Talon Wall, which is encumbered by the design of its continuous shelf which prevents the ability to properly apply and visually verify the efficacy of the required fire-retardant materials to fill the curtain wall voids at the point of installation, U-Wall's revolutionary anchor system allows for complete access to the curtain wall void during the installation process. Such construction allows fire safety professionals to fill the entire curtain wall void with material that is precisely compressed during the installation process, and visually verifiable in the field and is able to be documented as having been installed correctly.

81.     The ability to pack the materials after the panel installation process is critical to the ability to maintain the correct compression, as the size of curtain wall void will vary based upon the permissible tolerance along the facing of each concrete slab.

82.     Insufficient compression will not eliminate gaps through which oxygen can pass to feed a fire, while excessive compression reduces the retardant properties of the packing material.

83.     In the building facade industry, it can be highly beneficial for manufacturers of facade systems and component materials to obtain certifications to verify that the respective product(s) can meet technical standards for fire resistance. Such certifications can be useful to demonstrate the capabilities and/or integrity of the product in the event of a fire to building owners, contractors, architects and municipal authorities. Generally, a Published Design Listing under the

ASTM E 2307 standard is viewed as being the most reliable since it reflects that the product was independently peer reviewed and tested by a recognized and accredited certifying authority.

84.     Reflection's U-Wall is the only vertical notched curtain wall system that can legitimately claim to meet the accepted standard of being fire safe, having been tested, peer reviewed, *and* publicly Listed by an independent laboratory as ASTM E 2307 certified to prevent the internal spread of fire and hot gasses for the both the code minimum 2 hours and for 3 hours for use in high-rise occupancy.

85.     In pursuing a Published Design Listing for the U-Wall under ASTM E 2307, Reflection, at considerable expense, called upon a company named Intertek to provide an independent evaluation in accordance with the ASTM E 2307 test method for determining fire resistance of perimeter fire barriers.  Reflection also enlisted another company, Specified Technologies, Inc. to verify that the test was carried out in accordance with the ASTM E 2307 standards.  Intertek's evaluation resulted in the U-Wall being Listed to prevent the internal spread of fire and hot gasses for the both the code minimum 2 hours and for up to 3 hours for use in high-rise occupancy (see Sept. 27, 2021 listing STI-BPF-180-02 attached hereto as **Exhibit C**).

86.     To boost Talon Wall's sagging prospects in the face of increasing competition, LeVan attempted to partner with Kawneer Co., Inc., a prominent manufacture of curtain wall systems, to which he offered a license to manufacture Talon Wall.

87.     Upon information and belief, as part of its due diligence, Kawneer directed that Talon Wall be tested for fire safety by Intertek, which tested a multi-story mock-up of a Talon Wall facade in a controlled setting to determine the fire resistance of the curtain wall to prevent the passage of fire and hot gasses between floors.  A copy of the final report from these tests is submitted herewith as **Exhibit D** ("Kawneer Report").

88.     Incredibly, the Kawneer Report summarily concludes that the subject curtain wall "met the conditions of ASTM E2307" and attained the requisite fire safety rating, but a look at the detailed results of the report, including the test observations (Section 8) and photographs (Section 11) tell a vastly different and disturbing story.

89.     More particularly, relative the second-floor observations, the Kawneer Report identifies that the tested Talon Wall failed to meaningfully prevent the proliferation of smoke prior to 8 minutes into the test, that shortly after 12 minutes, ten (10) holes opened in the second story perimeter sealant, and within 22 minutes the holes enlarged and were releasing hot gasses. The observations of the Kawneer Report further note that flames appeared through holes in the sealant within 52 minutes, and that flames could be seen through the seal and into the second-floor space prior to the termination of the test at the two-hour mark.

90.     In accordance with International Building Code 715.4.1, the curtain wall void shall be "capable of preventing the passage of flame and hot gasses sufficient to ignite cotton waste where subjected to ASTM E 119 time-temperature fire conditions." However, the Kawneer Report fails to include any mention that cotton waste was presented at the myriad points of entry of hot gasses. The fact that such waste was not presented raises additional questions about conclusions of a passed test.

91.     Despite the obvious signs of failure before the 2-hour mark, the Kawneer Report remarkably summarizes that the tested specimen met the conditions of ASTM E 2307, albeit under an express qualification that the report "does not constitute a certification of [the] product nor an opinion or endorsement by [the Intertek] laboratory."

92.     Since the Kawneer Report was issued, LeVan has touted the report as validation of Talon Wall's fire safety to potential customers and members of the building construction industry who have and/or can influence purchasing decisions of building facade systems. Since the

Kawneer was issued however, Kawneer upon information and belief, has tellingly abandoned any interest in an association to build Talon Wall, and has directed LeVan to stop circulating the report so that the Kawneer name would not be associated therewith. Such facts undoubtedly demonstrate Kawneer's lack of confidence that the Talon Wall is able to actually meet the relevant fire safety standards as represented by LeVan.

93.     Upon information and belief, the test report has been reviewed by third parties having knowledge, skill and experience in fire safety evaluations who have expressed skepticism and/or serious concerns about its validity with regard to evidencing a passed test, and although such skepticism and concerns have been communicated to LeVan, he has nonetheless  continued to refer to and rely upon the Kawneer Report as evidence of a "passed test" in marketing communications which represent the Talon Wall as being capable of meeting the requisite fire safety criteria.

***Defendants Attempt New Tests that Fail to Replicate Talon Wall as Commercially Offered and Installed on Actual Buildings***

94.     On or around October 8, 2021, almost immediately after Reflection obtained and started promoting its ASTM E 2307 Published Design Listing for the U-Wall, an executive of the LeVan Companies, Mr. Jeffrey Testa, falsely represented himself as an engineer for Underwriters Laboratories and unlawfully gained access to a job site where Reflection's U-Wall was being installed. Upon information and belief, the purpose of such false impersonation and trespass was to photograph the application of fire-retardant packing during the U-Wall installation so that LeVan could attempt to replicate it in connection with the Talon Wall. True and correct photographs of Mr. Testa in the midst of conducting the corporate espionage are depicted below:

21

 

95.     Mr. Testa was identified in-part because he was previously employed by Reflection and known to be a *former* employee of Underwriters Laboratories.   Upon being spotted and confronted, Mr. Testa admitted that he gained access to the building site at the direction of LeVan.

96.     In or around December 2021, LeVan and the LeVan Companies commissioned Intertek to carry out new fire resistance testing on the Talon Wall in accordance with the ASTM E 2307 standard.   Upon information and belief, this new testing however was undertaken on a Talon Wall specimen that had fire-retardant material applied both prior to the installation of the curtain wall panel and through the sides of the test specimen which is wholly inaccessible during an actual field installation.   As noted above, such insulation had not been previously used in any of the Talon Wall systems that the LeVan Companies previously sold and installed in any high-rise buildings.

97.     The preemptive application of fire-retardant material on the Talon Wall test specimen prior to the installation of the curtain wall panel was a blind installation that precludes visual verification of properly compressed fire-retardant packing materials and makes it nearly impossible to ensure that there are no voids present.   Moreover, the stuffing of fire-retardant

packing into side areas that are inaccessible during a field installation of an actual Talon wall system reflects that the Talon Wall specimen tested at Intertek in December 2021 did not and could not reasonably conform to an actual Talon Wall product installed on a building from the standpoint of fire-inhibiting measures.

98.     In addition to anomalies with the fire-retardant materials of the Talon Wall test specimen, dubious liberties were taken with regard to other features of the specimen which further materially undermine the credibility and reliability of the test results. As one example, in constructing the test specimen, the bottom of the head joint was positioned on the order of only 5/8" above the top of the slab. This spacing represents the minimal condition for a Talon Wall installation – the spacing usually being on the order of 1 ¾" for a Talon Wall system installed on an actual building, and the maximum gap could be as much as approximately 3 ¼".

99.     The reduction of this spacing with regard to the test specimen would have, more likely than not, artificially restricted the passage of flame and hot gasses sufficient to ignite cotton waste as called for by the ASTM E 2307 standard. Such a deviation represents a departure and inconsistency with regard to usual commercially-installed Talon Wall systems and reflects an effort to deceptively rely on a carefully manipulated test to obtain a result that is incapable of being achieved with regard to the actual product.

100.     Upon information and belief, LeVan and the LeVan Companies did not commission any independent third-party peer firm or expert to review and/or sponsor the 2021 Intertek test of the Talon Wall test specimen to verify and ensure that the test specimen reliably replicated an actual Talon Wall system and that it was constructed and insulated in conformity with how a Talon Wall would be installed and insulated on a building. Instead, LeVan and the LeVan companies simply directed Intertek to carry out the test on the test specimen as constructed. In view of this,

the testing carried out on the Talon Wall specimen in December 2021 would not and could not form the basis of any Published Design Listing for under the ASTM E 2307 standard.

***Defendants Continue to Falsely Advertise the Fire-Resistance Capabilities of the Talon Wall***

101.     In competing against Reflection, LeVan has continued to falsely and deceptively represent that Talon Wall has capabilities, certifications and/or endorsements that are literally untrue and/or deceptively misrepresented. Such false and deceptive representations have been made in connection with the commercial promotion of Talon Wall, are materially deceiving and have and will cause harm to Reflection by way of diverting sales away from the U-Wall.

102.     As one example, LeVan has made commercial representations that falsely claim that the Talon Wall is the "only manufacturer's [sic] 'notched back' Curtainwall system in the world to pass and receive full scale, *peer reviewable, incontrovertible* ASTM 2307 fire test certification." (*emphasis added*) ("Talon Certification Claim").  The Talon Certification Claim is littered with both literally false and misleading claims that has and will cause material deception among purchasers and potential purchasers of building facade systems.

103.     As noted above, Reflection's U-Wall (which can be provided as a 'notched back Curtain Wall System) has a Published Design Listing for the U-Wall under ASTM E 2307.  Thus, commercial representations like the Talon Certification Claim deceptively represent that the Talon Wall is at least equal to Reflection's U-Wall in fire protection capability when it is plainly not. Commercial representations like the Talon Certification Claim are further deceptive from the standpoint that they are likely to casts suspicion on Reflection's truthful promotional claims about its Published Design Listing for the U-Wall from the standpoint that the Talon Certification Claim represents that the Talon Wall is the "*only*" system to have an ASTM 2307 certification.

104.     As establishment-type claims, the Talon Certification Claim and other commercial representations similar thereto made by LeVan and the LeVan Companies are further deceptive,

false and/or misleading from the standpoint that they are not supported by any reliable and credible tests whose methods can be replicated reliably on actual building construction. More particularly, for the reasons outlined above, neither the testing reported in the Kawneer Report, nor the later December 2021 testing by Intertek can be reasonably relied on as ASTM 2307 fire test certification, let alone one that could reasonably be characterized as "full scale" or "incontrovertible."

105. Commercial representations that the Talon Wall passed a "peer reviewable" ASTM 2307 fire test certification is equally deceptive and misleading in that it is likely to create the false impression that the commercially available Talon Wall was in fact independently validated by a peer authority when it has not. To the extent that "peer reviewable" has any actual meaning, it is certainly not equivalent to something that has been "peer reviewed." Notwithstanding, LeVan and the LeVan Companies use the phrase "peer reviewable" to deceptively obscure this difference to deceive and confuse potential purchasers in to mistakenly believing that the Talon Wall has been "peer reviewed" when it has not.

106. LeVan and the LeVan Companies have made additional false and deceptive commercial representations which suggested that the Talon Wall has been certified for fire-safety by Underwriters Laboratories ("UL") when it has not. UL is well-known as a global safety certification company and particularly highly regarded with regard to evaluating firestop system designs of building materials. Attempting to deceptively trade off UL's esteemed reputation for fire safety, LeVan and the LeVan companies have prominently displayed indication of having UL recognition as part of commercial promotion for the Talon Wall, including displaying UL signage at trade show exhibits for the Talon Wall.

107. Such promotional communication and display of UL recognition by LeVan and the LeVan Companies was intended to deceive the public into thinking that UL had certified or

endorsed the Talon Wall for fire safety capabilities when it has not. Upon information and belief, on or in January of 2021 UL contacted LeVan and/or the LeVan companies and demanded that they discontinue displaying UL indications in association with the Talon Wall out of concern that such indications were materially deceptive and misleading.

***LeVan's Wrongful Interference and Unfair Methods of Competition***

108. Desperate to stave off Reflection's momentum after the baseless trade secret claims were dismissed, LeVan caused his Companies in December of 2021 to file another action against Reflection this time for patent infringement (Case No. 1:21-cv-06618)("the Patent Infringement Lawsuit"). In addition to naming Reflection as a defendant, the LeVan Companies' patent infringement lawsuit names, a litany of parties associated with projects where Talon Wall was spurned in favor of Reflection's U-Wall.

109. Like the trade secret case that was filed and dismissed, the Patent Infringement Lawsuit was also filed as a baseless attempt to negate U-Wall's competitive advantage in the marketplace, and to bolster Talon Wall's fast-fleeting relevancy in the curtain wall industry.

110. Shortly after filing the Patent Infringement Lawsuit, in or around January 2022, LeVan caused the widespread release and publication of a "news release" reporting the lawsuit and allegations that Reflection's U-Wall or U-8000 is a "knock-off" building facade incorporating the patented Talon Wall system. The January news release was widely disseminated via a number of online media outlets.

111. LeVan followed up the January 2022 news blast by causing the publication of article posted to U.S. Glass Magazine website on or around March 21, 2022 which reported that the LeVan Companies filed an amended complaint in the Patent Infringement Lawsuit. Although the article does not mention that the amended complaint was necessitated by a motion calling for the dismissal of the LeVan Companies' original defective complaint, it restated the baseless claims

with additional commentary, even going so far as to falsely represent that Reflection's own website advertises and acknowledges that the U-Wall "is based on the Talon Wall System." Needless to say, Reflection's website did not include any acknowledgement that the U-Wall is based on the Talon Wall System as publicized.

112. U.S. Glass Magazine is one of the more widely read publications in building facade industry and the article was released only days before a widely attended industry trade show to attempt to ensure that it would be top of mind among members of the industry. Such publication caused actual economic harm to Reflection in the form of loss of prospective business opportunities and diminishment of goodwill in the Reflection brand arising from reputational harm.

113. LeVan additionally paraded a copy of the complaint before developers, architects and prominent general contractors, threatening to add them as defendants to the Patent Infringement Lawsuit if they went forward with purchasing and utilizing Reflection's U-Wall. In several instances, the Talon Wall was not even being considered for a project and LeVan's unsolicited interference was made solely to thwart Reflection from receiving the project and receiving the corresponding economic benefit thereof.

114. Specifically, and among others, in or about March of 2022, after Reflection was awarded a project for a new office building to be part of the Reston Town Center Gateway in Reston, Virginia and had executed contracts for the provision of a U-Wall, LeVan sent an executive at the general contractor Clark Construction an electronic communication with a copy of the patent infringement suit. LeVan's communication was made as a tacit threat of adding Clark Construction as a defendant if they did not walk away from the Reflection deal and reconsider using Talon Wall.

115.    The Clark Construction group acquiesced, terminating Reflection's $12MM contract "for convenience." Upon information and belief, the decision by Clark Construction to cancel Reflection's contract was a direct and proximate cause of the threat made by LeVan.

116.    Similarly, in or about February 2022, after Reflection was awarded a contract to supply a U-Wall system for a residential high-rise building at 4600 Marine Drive in Chicago, Illinois, LeVan threatened the building owner with a copy of the lawsuit, prompting it to convert the exterior facade to a window wall system (for which Reflection was experiencing a backlog in-part due to supply chain issues). Upon information and belief, the building owner's decision to forego consideration of Reflection's U-Wall was a direct and proximate cause of the threats made by LeVan.  The conversion of this project to specify a window wall resulted in economic harm to Reflection including the loss of substantial profits.

117.    LeVan further made similar threats through his representatives and licensees to the owner of a building at 1010 Church Street in Nashville, Tennessee in or about February 2022. Despite Reflection initially having established a viable opportunity to be awarded this project, the owner ultimately declined to consider Reflection's bid to install U-Wall, requiring Reflection to bid the job using a window wall system.  Upon information and belief, the building owner's decision to forego consideration of Reflection's U-Wall was a direct and proximate cause of the threats made by LeVan.  The conversion of this project to specify a window wall resulted in economic harm to Reflection including the loss of substantial profits.

118.    Another instance of wrongful interference by LeVan and the LeVan Companies took place in or around the week of March 28, 2022 in connection with a $17M project at 1112 W. Carroll Ave. in Chicago, Illinois.  Notably, after U-Wall was already specified as the basis of design and Reflection made substantial investments to be awarded the project including providing free design consultancy to the architect and general contractor on the project for nearly a year (at

great cost to Reflection), LeVan separately contacted the owner, the general contractor and the architect (who had already included U-Wall in all of the spec drawings) and threatened to add each of them to the suit if they went forward with Reflection. Shortly thereafter, the owner removed Reflection's U-Wall from consideration for the project. On or about April 1, 2022, Reflection was informed by the general contractor that the owner's removal of Reflection's U-Wall from consideration was a direct and proximate cause of the threats made by LeVan. The removal of U-Wall from consideration on this project resulted in economic harm to Reflection including the loss of substantial profits.

119.    The wrongful and unsolicited pattern of interference and disparagement of the type described above was carried out intentionally by LeVan and the LeVan companies without justification to cause economic and competitive harm to Reflection. Such acts prevented Reflection from consummating valid business opportunities that Reflection otherwise had a reasonable expectation of obtaining and has cause substantial harm to Reflection's business.

120.    The LeVan Companies have additionally deceptively engaged in acts of false patent marking by displaying and listing, and/or causing to be displayed and listed, "U.S. Patent No. 10,094,111" ("the '111 Patent") and/or other equivalent indications in connection with the advertisement and promotion of its Talon Wall system.

121.    **Exhibit E** attached hereto, a true and correct image taken from the home page of the Entekk company website (https://entekk.com) which is freely accessible to the public, lists the '111 Patent in association with promoting the Talon Wall and comprises an example of such false marking. The listing of the '111 Patent in association with the Talon Wall on the Entekk website communicates to the public that the Talon Wall is covered by the '111 Patent.

122.    Contrary to the noted patent designation, the Talon Wall does not embody subject matter covered by any valid claim of the '111 Patent. More particularly, independent claim 1 of

the '111 Patent (the lone independent claim) recites a "[a] building facade system comprising [among other things] a shelf member …*directly supported* on a first building floor slab." The Talon Wall, however, does not exhibit a shelf member directly supported on any floor slab. Instead, the commercially available Talon Wall utilizes a "floating" shelf member design whereby the shelf member is supported by a bolt (or post) and elevated above the building floor slab with a gap between the shelf member and floor slab.

123. Since the commercially available Talon Wall does not utilize a shelf member "directly supported" on a floor slab, it is not covered by independent claim 1 of the '111 Patent. Moreover, since dependent claims of a patent incorporate all limitations of the respective independent claim by reference, none of remaining dependent claims 2-20 of the '111 Patent cover the commercially available Talon Wall. As such, LeVan and the LeVan Companies' commercial representation and/or indication that that Talon Wall is covered by the '111 Patent is untrue and constitutes an act of false marking under the United States Patent Act.

## COUNT I

**(Against All Defendants for False Advertising
in Violation of the Lanham Act, 15 U.S.C. § 1125(a))**

124. Reflection repeats and realleges each of the allegations in paragraphs 1-123 as though set forth in full herein.

125. As set forth above, Defendants knowingly and intentionally published and distributed to the public the false, misleading, and deceptive statements of fact in its advertising and promotional materials with the specific intent to sell, distribute, and increase the demand of the Levan Companies' products and services, and to harm and decrease the sales of Reflection's products and services.

30

126.    More particularly, Defendants have deceptively represented that the Talon Wall system has fire safety capabilities, certifications and/or test results that it does not have and that the fire stopping capabilities of the Talon Wall are supported by valid engineering judgments when they are not.

127.    The actions and statements by Defendants described and detailed above, constitute false or misleading description of facts and/or false or misleading representation of facts made in commercial advertising and promotion that misrepresent the nature, characteristics, or qualities of the Levan Companies' goods, services, and commercial activities in violation of section 43(a)(1)(B) of the Lanham Act (15 U.S.C. §1125(a)(1)(B)).

128.    The Defendants' materially false and/or misleading statements of fact alleged herein have materially deceived and will continue to deceive a significant portion of the relevant segment of purchasers of building facade systems, and are likely to influence the purchasing decisions of a significant portion of the relevant segment of purchasers.

129.    Reflection has been damaged by the actions of the Defendants, including millions of dollars in lost profits.

130.    As a direct and proximate result of the acts alleged herein, and in additional to its monetary damages, Reflection has suffered, is suffering and will continue to suffer irreparable damage in the marketplace, unless Defendants are restrained from continuing their wrongful acts, and Reflection has no adequate remedy at law for such damage.

131.    Defendants' false advertising is knowing and willful. Reflection is entitled to injunctive relief and to the recovery of all available damages, attorneys' fees, costs and the LeVan Companies' profits.

132.    This is an exceptional case within the meaning of Section 35 of the Lanham Act, 15 U.S.C. § 1117.

<u>**COUNT II**</u>

**(Against All Defendants for False Marking in Violation of 35 U.S.C. § 292)**

133.     Reflection repeats and realleges each of the allegations in paragraphs 1-132 as though set forth in full herein.

134.     Levan and the Levan Companies have displayed and listed, and/or cause to be displayed and listed, "U.S. Patent No. 10,094,111" and/or other equivalent indications on advertising and promotion, etc., for its Talon Wall system.

135.     The Talon Wall system commercially offered for sale, sold and installed is not subject to patent protection by U.S. Patent No. 10,094,111 ("the '111 Patent").

136.     LeVan and the LeVan Companies knew or reasonably should have known that the Talon Wall system commercially offered for sale, sold and installed is not subject to patent protection by the '111 Patent.

137.     By listing and including the '111 Patent in connection with commercial promotions for the Talon Wall, Defendants intended to deceive the public into thinking that the Talon Wall was covered by the '111 Patent when it was not.

138.     Levan and the Levan Companies' actions as alleged herein constitute false marking in violation of 35 U.S.C. § 292, second paragraph.

<u>**COUNT III**</u>

**(Against All Defendants for Violation Of Illinois Uniform
Deceptive Trade Practices Act (815 ILSC § 510/1 *et seq*.))**

139.     Reflection repeats and realleges each of the allegations in paragraphs 1-138 as though set forth in full herein.

140.     Reflection competes with the Levan Companies with regard to building facade systems in Illinois, and elsewhere.

32

141.    As set forth above, the Defendants' actions involve advertising and trade practices which are addressed to the market generally and implicate consumer protection concerns.

142.    The acts alleged above against Defendants constitute violations of the Illinois Deceptive Trade Practices Act, as they constitutes deceptive acts or practices in the course of business, trade or commerce in violation of 815 ILCS 510/2, including misrepresentation and concealment or omission of material facts in its advertising, with intent that others rely upon the misrepresentation, concealment or omission of such material facts.

143.    Reflection has been damaged by the Defendants' actions, including but not limited to loss of earnings, and injury to its reputation and goodwill.

144.    By reason of the acts alleged herein, Reflection has suffered, is suffering and will continue to suffer irreparable damage unless Defendants are restrained from continuing their wrongful acts.

145.    Reflection has no adequate remedy at law.

## COUNT IV

**(Against All Defendants for Violation of Illinois Consumer Fraud
and Deceptive Trade Practices Act (815 ILSC § 505/1 et seq.))**

146.    Reflection repeats and realleges each of the allegations in paragraphs 1-145 as though set forth in full herein.

147.    The Defendants' acts alleged above constitute violations of the Illinois Deceptive Trade Practices Act.

148.    Defendants have intentionally used or employed deception, fraud, false pretense, false promise and/or misrepresentation in the conduct of trade or commerce by falsely representing and/or misrepresenting the fire safety properties, capabilities and/or performance and of the Talon Wall system in marketing and promotion published to third parties.  Such acts have materially

33

deceived and will continue to deceive a significant portion of the relevant segment of purchasers of building facade systems, and are likely to influence the purchasing decisions of a significant portion of the relevant segment of purchasers.

149.    Defendants made intentionally deceptive, fraudulent, false and misleading misrepresentations regarding fire safety properties, capabilities and/or performance and of the Talon Wall system with the specific intent to sell, distribute, and increase the consumption of the Talon Wall system, and to harm and decrease the sales of Reflection's products and services.

150.    Defendants' conduct constitutes deceptive acts or practices in the course of business, trade or commerce in violation of 815 ILCS 505/2, including misrepresentation and concealment or omission of material facts in its advertising, with intent that others rely upon the misrepresentation, concealment or omission of such material facts.

151.    Purchasers and prospective purchasers are likely to be, and have been, confused, mistaken or deceived as a consequence of Defendants' false and/or misleading representations regarding the fire safety of the Talon Wall system.

152.    Reflection has been damaged, including its loss of past earnings, and is suffering and will continue to suffer monetary and irreparable damage and, unless Levan and the Levan Companies are restrained from continuing their wrongful acts, the damage to Reflection will be increased. Reflection has no adequate remedy at law.

153.    Reflection is entitled to injunctive relief and to the recovery of damages, attorneys' fees, costs and the disgorgement of Defendants' profits.

154.    Defendants' deceptive practices are knowing and willful, warranting punitive damages.

## COUNT V

### (Against All Defendants for Common Law Unfair Competition)

155.    Reflection repeats and realleges each of the allegations in paragraphs 1-154 as though set forth in full herein.

156.    Both Reflection and the Levan Companies are engaged in trade and commerce in the state of Illinois and both are engaged in interstate trade or commerce.

157.    The Defendants' actions constitute or involve advertising and trade practices which are addressed to the market generally and implicate consumer protection concerns.

158.    Defendants' actions and conduct described and detailed above constitutes unfair competition, including misrepresentation and concealment or omission of material facts in its advertising.

159.    Defendants intended that persons and entities making or involved with the decisions relating to the purchase of building facade systems rely upon Defendants' misrepresentation, concealment or omission of such material facts.

160.    Defendants have actually deceived, and its acts have the tendency to deceive a substantial segment of consumers, who have relied or will likely rely on Defendants' false statements in making purchasing decisions regarding building facade systems.

161.    As a direct and proximate result of these actions, Reflection has suffered and will continue to suffer significant monetary damages.

162.    In addition to monetary injury, Defendants' unfair competition has caused and will continue to cause Reflection to suffer irreparable injury for which there is no adequate remedy at law, entitling Reflection to injunctive relief.

163.    In addition, based on the willful nature of Defendants' actions, Reflection is entitled to punitive damages.

35

## COUNT VI

**(Against All Defendants for Commercial Disparagement)**

164.    Reflection repeats and realleges each of the allegations in paragraphs 1-163 as though set forth in full herein.

165.    As alleged above, Defendants have made a myriad of false statements concerning Reflection and Reflection's products, including statements that Reflection and/or its U-Wall system is a "knock-off" and "based on the Talon Wall System."  Defendants' statements that the Talon Wall is the "only notched curtain wall system that is certified to be fire safe" additionally falsely disparages Reflection from the standpoint of inferring that the U-Wall System is not a Published Design Listed System for fire safety when it fact it is.

166.    The false statements referenced herein have been published by Defendants through distribution of marketing materials, by speech, conduct, and in writing and disseminated to persons and entities other than Reflection.

167.    The Defendants actions constitute Commercial Disparagement  pursuant to Illinois law.

## COUNT VII

**(Against All Defendants for Intentional Interference with
Existing and Potential Contractual Relationships)**

168.    Reflection repeats and realleges each of the allegations in paragraphs 1-167 as though set forth in full herein.

169.    Reflection had and continues to have reasonable expectations of entering into and continuing valid business relationships with entities that purchase or are interested in purchasing building facade systems including Reflection's U-Wall system.

170.    Defendants knew of Reflection's expectations with regard to entering into and continuing valid business relationships with entities who purchase or are interested in purchasing building facade systems.  Defendants intentionally and without justification interfered with such expectations.

171.    Defendants' intentional tortious acts, alleged herein, destabilized, subverted and made it more expensive and/or burdensome for Reflection to obtain and/or maintain its contracts and potential contracts, and caused Reflection to suffer damages including the loss of projects that had already been awarded to Reflection.

## COUNT VIII

### (Against All Defendants for Abuse of Process)

172.    Reflection repeats and realleges each of the allegations in paragraphs 1-171 as though set forth in full herein.

173.    LeVan directed the filing of the baseless action alleging infringement of trade secrets solely to harass Reflection, and to serve as cover to make false and defamatory statements to developers, contractors and others in the industry that inferred that Reflection was dishonest, that it stole LeVan's designs and/or that Reflection's revolutionary new U-Wall System was just a knock off of Talon Wall.

174.    When the Circuit Court summarily dismissed the trade secret complaint in its entirety, LeVan and the LeVan Companies filed an equally baseless patent claim in this Court, for the purpose of aggressively extorting and intimidating developers and architects and contractors, to prevent them from using the U-Wall system and to attempt to disparage Reflection in the building industry by publicizing the baseless claims in the media as it they were true.

175. As a direct and proximate result of the Defendants' conduct, Reflection has been injured in the manner described above.

176. The filing of these baseless suits by LeVan and the LeVan Companies constitutes an abuse of process, motivated by malice and intended for the purposes of injuring and gaining an unfair advantage over Reflection.

WHEREFORE, Reflection requests that this Court enter judgement in its favor and against Defendants, jointly and severally, on all Counts, and order:

A. An award of compensatory damages in an amount to be determined, including:

(i) Reflections profits lost as a direct and proximate result of Defendants' conduct;

(ii) treble damages pursuant to 15 U.S.C. § 1117 in connection with Defendants' acts of false advertising;

(iii) an amount equal to profits realized by Defendants through its wrongful conduct that should be disgorged to Plaintiff; and/or

(iv) an amount sufficient to engage in corrective advertising to counter the false and misleading statements of, in an amount at least equal to the total advertising dollars spent by the Defendants in engaging in the wrongful advertising and promotion;

B. Defendants to pay punitive damages in an amount to be determined by the Court to dissuade wrongful conduct in the future;

C. That Defendants, and their respective shareholders, members, managers, officers, directors, employees, servants, agents, distributors and persons in active concert with them be preliminarily and permanently enjoined from engaging in the activities complained of herein pursuant to 15 U.S.C. § 1116(a);

D.  Awarding Reflection its costs, expenses and reasonable attorney's fees incurred in connection with these proceedings; and

E.  Granting such other or further relief that this Court deems necessary or appropriate.

## **JURY DEMAND**

Reflection demands a jury trial on all Claims which are permitted to be tried by jury under the law and the Federal Rules of Civil Procedure.

Dated: July 6, 2022

Respectfully submitted,

**REFLECTION WINDOW & WALL, LLC**

By:  ___/s/ George J. Spathis___
One of Their Attorneys

George J. Spathis (ARDC No. 6204509)
Jason B. Hirsh (ARDC No. 6283094)
George S. Pavlik (ARDC No. 6282848)
LEVENFELD PEARLSTEIN, LLC
2 North LaSalle Street, Suite 1300
Chicago, IL 60602
Tel: 312-346-8380
gspathis@lplegal.com
jhirsh@lplegal.com
gpavlik@lplegal.com